Halley Josephs (Bar No. 338391)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Tel. (310) 789-3100
Fax (310) 789-3150
hjosephs@susmangodfrey.com

Natasha Fernández-Silber (*pro hac vice forthcoming*)*
EDELSON PC
350 N La Salle Dr., 14th Floor
Chicago, IL 60654
Tel. (312) 589-6370
Fax (312) 589-6378
nfernandezsilber@edelson.com
*Admitted in Michigan and New York only

*Attorneys for Plaintiff*
*Additional counsel listed on signature page*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

COMMUNITY CARE PHARMACY, LLC, on behalf of itself and all others similarly situated,

      Plaintiff,

v.

GOODRX, INC.; GOODRX HOLDINGS, INC.,

      Defendants.

Case No. 2:24-cv-9490

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Community Care Pharmacy, LLC ("Community Care") is an independent pharmacy based in Garden City, Michigan. It brings this action on behalf of itself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23 against Defendants GoodRx, Inc. and GoodRx Holdings, Inc. (collectively, "GoodRx") for orchestrating a horizonal conspiracy among certain pharmacy benefit managers ("PBMs") to fix and suppress the rates of reimbursement paid to independent pharmacies for generic drugs. Plaintiff alleges as follows upon personal knowledge as to itself and its own acts and experiences, and as to all other matters upon information and belief.

## I.    NATURE OF THE ACTION

1.    PBMs administer pharmacy benefits on behalf of health-insurance plans and other third-party payors ("TPPs") of prescription drugs. Among other functions, PBMs negotiate the prices that TPPs must pay pharmacies for prescription drugs and process pharmacies' claims for reimbursement based (in theory) on those pre-negotiated prices.

2.    This case involves an unlawful price-fixing agreement among several PBMs—orchestrated by the PBM rate aggregator, GoodRx—to suppress the prices paid to independent pharmacies for generic drugs. Since January 1, 2024, and possibly sooner, at least four PBMs—CVS Caremark ("Caremark"), Express Scripts, MedImpact, and Navitus Health Solutions ("Navitus") (the "Conspiring PBMs")—have agreed to participate in GoodRx's Integrated Savings Program ("ISP"). As part of the ISP, the Conspiring PBMs agree to outsource their pharmacy reimbursement rate decisions on generic drugs to a mutual third party, GoodRx, which sets the rates of reimbursement for them with full knowledge of competitively sensitive information ("CSI") across ostensibly rivalrous PBMs. Through their ISP agreements with GoodRx, the Conspiring PBMs (which are horizontal competitors) agree not to outbid one another on the prices they will pay pharmacies for generic drugs. This

unlawful price-fixing agreement is referred to herein as the "GoodRx ISP Scheme" or "Scheme."

3.      The CSI at the heart of the GoodRx ISP Scheme is the reimbursement rates that individual PBMs have negotiated with pharmacies for generic drugs. GoodRx obtains this proprietary, confidential information from the roster of PBMs it works with for the popular GoodRx discount card. The GoodRx discount card (described further below) makes PBM-negotiated drug prices (often called "Negotiated Rates") available directly to consumers, so long as they pay cash for prescription drugs (rather than utilize any insurance benefits they may or may not have). Consumers who use GoodRx's discount card do not know which PBMs' Negotiated Rates they are getting the benefit of. Behind the scenes, the PBM whose Negotiated Rate is leveraged (the "Leveraged PBM") processes the transaction and collects a fee from the pharmacy. The Leveraged PBM then shares a portion of that fee with GoodRx.

4.      Collectively, the PBMs that share their CSI with GoodRx for its discount card business (in exchange for their portion of the fees remitted by pharmacies) control roughly 95% of the PBM Services Market (defined below), meaning they are responsible for managing 95% of all pharmacy reimbursement claims. On information and belief, these PBMs include CVS Caremark, Express Scripts, OptumRx, CarelonRx, Envolve Pharmacy Solutions, Prime Therapeutics, Kaiser Permanente Pharmacy, Humana Pharmacy Solutions, MedImpact, Navitus Health Solutions, SS and C Health, and Perform Rx. They comprise what's referred to herein as the "GoodRx Information Exchange Network."

5.      This antitrust action is not about the GoodRx discount card itself, but rather a new line of business GoodRx has rolled out called the Integrated Savings Program ("ISP"). At bottom, the ISP is an invitation to PBMs to engage in price fixing. As part of the ISP, GoodRx contracts with certain PBMs (i.e., the Conspiring PBMs) to "integrate" GoodRx's pricing technology into those PBMs' internal claims processing systems. This integration allows the Conspiring PBMs to use GoodRx's

1   pricing algorithm—as well as CSI from GoodRx's Information Exchange Network—

2   to calculate pharmacy reimbursement rates for prescriptions filled for patients in-

3   sured by their third-party payor clients (often referred to by PBMs as "covered

4   lives"). For each claim subject to the Scheme, the Conspiring PBM automatically

5   pays the dispensing pharmacy the lowest reimbursement rate negotiated by any PBM

6   in the GoodRx Information Exchange Network (the "ISP Rate").

7       6.    In public disclosures, GoodRx describes the ISP as follows: "Our inte-

8   grated savings program embeds GoodRx directly into the member's funded benefit

9   plan." According to the company, patients simply show their insurance card "at the

10  pharmacy counter, as they normally would" and "behind the scenes, [GoodRx's] ISP

11  technology compares" the patient's "insurance plan" price for the drug with

12  "GoodRx's discount price." "[E]ligible insurance plan members"—i.e., individuals

13  whose pharmacy benefits are managed by a Conspiring PBM—then get "automatic

14  access to GoodRx's prescription prices." That's because (as GoodRx admits) all

15  PBMs that participate in the ISP agree to calculate pharmacy reimbursement rates for

16  generic drugs in the same way based on the "[l]esser of" (a) the patient's "insurance

17  price" (the drug price the PBM that manages that patient's insurance benefits has

18  negotiated with the dispensing pharmacy), or (b) the "GoodRx price" (the lowest

19  price any PBM in the GoodRx Information-Exchange Network has negotiated for the

20  same drug). Put differently, instead of using the pharmacy reimbursement rate that

21  each third-party payor's own PBM (the "Primary PBM") has previously negotiated

22  with the dispensing pharmacy, the ISP imposes a different, lower rate of reimburse-

23  ment negotiated by an entirely different PBM (the "Leveraged PBM") on behalf of

24  entirely different third-party payors.

25      7.    The upshot of this Scheme is that the Conspiring PBMs, by coordinating

26  their reimbursement decisions through GoodRx, never pay pharmacies more for ge-

27  neric drugs than any rival PBM has agreed to pay in its separate negotiations with

28  those pharmacies. This is nothing more than price fixing in two simple steps: First,

the Conspiring PBMs exchange CSI between themselves (using GoodRx as a conduit). Second, they all agree to pay the lowest pharmacy reimbursement rate negotiated by any PBM within the GoodRx Information-Exchange Network (which GoodRx identifies).

8.    In the absence of such unlawful coordination, the Conspiring PBMs would have to compete for pharmacies to join their pharmacy networks, including by offering to pay them higher rates of reimbursement for generic drugs (which account for over 90% of all prescriptions) than rival PBMs. The ISP Scheme corrupts this competition between PBMs for network pharmacy services.

9.    A PBM's pharmacy network is the group of pharmacies that contract with that PBM to provide prescription medications to the PBM's third-party payor clients (and their insured members) under specific terms and pricing agreements. The attractiveness of a health plan is based in part on the breadth of the pharmacy network its members can conveniently access. Any PBM that cannot attract pharmacies (a must-have input) to its network will suffer competitive harms in the downstream market for PBM services sold to third-party payors (the "PBM Services Market"), since those third-party payors need to offer broad and convenient pharmacy networks to attract members into their health plans. In turn, a pharmacy's willingness to join a PBM's network depends on the competitiveness of the reimbursement rates it offers and whether those rates allow the pharmacy to operate with a reasonable profit margin.

10.    The ISP Scheme curtails this competition among PBMs for pharmacies. Rather than having to pay *more* for generic drugs than rival PBMs to attract pharmacies to their networks, on a claim-by-claim basis, the Conspiring PBMs now always pay the *lowest* pharmacy reimbursement rate that any rival PBM has succeeded in negotiating—without losing access to network pharmacy services (a necessary input). That's because the Conspiring PBMs control 64% of the PBM Services Market (and thus approximately 64% of all prescriptions filled each year), meaning

pharmacies cannot refuse to do business with all of them. Put differently, the Conspiring PBMs control a choke point for any pharmacy seeking to gain access to payors and patients.

11.     The Conspiring PBMs benefit from the ISP Scheme in different ways. The smaller participating PBMs—MedImpact and Navitus, whose market shares are roughly 5% and 2%, respectively—can consistently free-ride off the reimbursement rates negotiated by larger PBMs at the expense of independent pharmacies. Because of the Scheme, the Conspiring PBMs MedImpact and Navitus now pay the same low reimbursement rates for generic drugs as the nation's largest PBMs: Caremark and Express Scripts, which account for a combined 57% of the national PBM Services Market. In the absence of the ISP Scheme, smaller PBMs like MedImpact and Navitus would not generally qualify for the same volume discounts from pharmacies as Caremark or Express Scripts; they would have to outbid their larger rivals to attract pharmacies to their networks.

12.     The two largest Conspiring PBMs—Caremark and Express Scripts—have market shares of 34% and 23%, respectively, and have different incentives for participating in the ISP Scheme. Given their buying power, Caremark and Express Scripts are already able to negotiate the best average discounts from pharmacies. However, this does not mean that for any given drug, these PBMs will have secured the lowest price. Instead, it means that across all drugs, these large PBMs will generally obtain the best total discount package from pharmacies. The ISP Scheme ensures that for *every* generic prescription, the Conspiring PBMs *always* pay the lowest price negotiated by any rival PBM.

13.     Moreover, the ISP Scheme enables the Conspiring PBMs—in particular, the largest PBMs with the most negotiating power, Caremark and Express Scripts—to profit from fees charged to dispensing pharmacies. As a function of the Scheme, any time the ISP Rate is applied as part of the member's plan benefit, GoodRx charges the pharmacy a fee for the transaction (sometimes called a

"clawback" fee). This fee is then shared among the participants of the ISP scheme, including, on information and belief, GoodRx, the Primary PBM, and the Leveraged PBM. Because the rates negotiated by Caremark and Express Scripts will often be the lowest (and thus are adopted as the ISP Rate), these two Conspiring PBMs stand to gain hundreds of millions of dollars a year from their cut of the clawback fees generated by the ISP Scheme. Rather than passing on the entirety of these fees to payors as "savings," the Conspiring PBMs pocket at least a portion of them as profit.

14.    Notably, the fees extracted from pharmacies under the ISP Scheme reflect a gap—or "spread"—between (a) the amount paid by the third-party payor (and its insured member) to its retained PBM, and (b) the net amount the pharmacy receives from that PBM for dispensing the prescription. Historically, retaining such "spreads" as profit was an important revenue stream for PBMs. However, the practice of "spread retention" (or "spread pricing") has been harshly criticized in recent years for raising drug prices and harming pharmacies, and many health plans now require their PBMs to "pass through" all negotiated discounts with pharmacies in full, thus precluding spread retention.[1] The ISP Scheme allows the Conspiring PBMs to re-introduce spread retention into their business models without violating the pass-through requirements in contracts with their own third-party payor clients. That's because for each prescription subject to the ISP Scheme, the PBM that retains the spread (i.e., the clawback fee) is not the PBM that was retained to process the claim on behalf of the third-party payor. Instead, the fee is collected by GoodRx, which has

---

[1] *See Prescription Drugs: Selected States' Regulation of Pharmacy Benefit Managers* at 1 (March 2024), available at https://www.gao.gov/products/gao-24-106898 (noting criticism). In some states, spread retention has even been banned by statute. California, Louisiana, Maine, and New York have enacted laws imposing a fiduciary duty on PBMs to act in the best interest of the health plan or other entity to which the duty is owed. *See id.* at 10-11. In addition, Arkansas has flatly prohibited the practice of spread pricing, while Louisiana prohibits spread pricing unless a PBM provides regular written notice to policyholders indicating the aggregate spread pricing amounts charged by the PBM. *Id.* at 12.

CLASS ACTION COMPLAINT
Case No.: 2:24-cv-9490

no contractual relationship to the patient or the payor. On information and belief, GoodRx then distributes this spread to the members of the ISP Scheme.

15. For its part in orchestrating the Scheme, GoodRx retains about $5 per transaction mediated through the ISP. This new revenue stream—which GoodRx sees as "$200M+ in growth opportunity"—is critical to GoodRx's long-term viability given the existential issues facing its traditional discount-card business.

16. In recent years, many pharmacies, including Plaintiff, have stopped accepting GoodRx's traditional discount cards because they typically lose money on these transactions. Pharmacy defections have led to massive disruptions in GoodRx's stock value. By "embed[ding] GoodRx directly into the … benefit plan[s]" administered by the Conspiring PBMs, the ISP Scheme eliminates pharmacies' ability to opt out of transacting with GoodRx. Because of the Conspiring PBMs' dominant market share, pharmacies have little choice but to transact with the Conspiring PBMs. Now, under the ISP Scheme, the Conspiring PBMs automatically apply the ISP Rate as part of a member's plan benefit without the need for any external GoodRx discount card to be presented to or accepted at the pharmacy desk. GoodRx and the Conspiring PBMs then extract and share a compulsory fee from the dispensing pharmacy on the back end.

17. The "savings" generated by the ISP Scheme come at the expense of already distressed independent pharmacies. Since going live, the ISP Scheme has dramatically suppressed reimbursement rates paid to independent pharmacies for generic drugs. GoodRx estimates that some 500 to 600 million prescriptions will be subject to the ISP annually. On each of those prescriptions, when the ISP Rate is leveraged, pharmacies are reimbursed at rates far lower than what they would have received absent the Scheme.

18. Plaintiff Community Care does not accept the GoodRx discount card. But like other independent pharmacies, Community Care has filled numerous generic prescriptions for insured patients that were subject to the ISP Scheme. For these

transactions, the customer presented their normal health insurance card to a Community Care pharmacist. These cards contain the six-digit Bank Identification Number ("BIN") associated with the PBM that the patient's health plan uses to administer pharmacy benefits (i.e., the Primary PBM). As is standard practice, Community Care would then route its claim for reimbursement to this PBM. Ordinarily, the Primary PBM determines the amount the patient and its insurer owe the pharmacy (based on the reimbursement rates that same PBM has negotiated with the dispensing pharmacy). But for prescriptions subject to the Scheme, Community Care's reimbursement claims have been routed to a different PBM (i.e., the Leveraged PBM), and Community Care receives a claim summary containing the Leveraged PBM's BIN, followed by the letters "GDRX." These claim summaries also contain notations stating that the reimbursement amount has been calculated based on a "discount contract" (rather than the pharmacy's network agreement with the Primary PBM). For example, where the Primary PBM is Caremark, this notation states, "non-cmk discount contract." On information and belief, the reimbursement amounts for these claims are based on the Leveraged PBM's Negotiated Rates—rather than the Primary PBM's Negotiated Rates with the dispensing pharmacy—pursuant to an unlawful agreement between GoodRx and the Conspiring PBMs to automatically apply the lowest Negotiated Rate in the GoodRx Information Exchange Network (the ISP Rate) as part of the patient's plan benefits.

19.    These rerouted claims also reflect a "Processing Fee" of between $7 and $10, which Community Care must pay to the Conspiring PBMs. On information and belief, such processing fees—which do not ordinarily appear on claims submitted to insurance—are assessed by GoodRx and then shared among the Conspiring PBMs. Community Care Pharmacy has suffered significant losses as a result of the ISP Scheme. On many of these claims, instead of receiving payment from the Primary PBM for the drugs it has dispensed, Community Care has actually owed money.

20.     The GoodRx ISP Scheme is merely the latest exploitative tactic devised by the PBM industry to extract profits from pharmacies and TPPs. After two decades of intense consolidation of the PBM industry—and of PBMs' vertical integration with other parts of the drug supply chain—the largest PBMs have amassed an unfathomable degree of buying (or monopsony) power vis-à-vis pharmacies. And they have wielded this monopsony power to decimate independent pharmacies like Plaintiff Community Care, which they view as competitors to their own PBM-affiliated pharmacies.

21.     Since 2019, there have been over 7,000 retail pharmacy closures in the United States, over half of which were independent pharmacies. In 2023 alone, 300 independent pharmacies closed, with more closures expected in 2024. Such closures harm both pharmacists and the communities they serve, imperiling access to medication and other health services for millions of Americans. Today, over 45% of all U.S. counties have at least one neighborhood that qualifies as a "pharmacy desert," including one-third of all neighborhoods in the 30 largest US cities, affecting nearly 15 million people. The ISP Scheme is poised to further exacerbate this crisis. Not only do generic drugs account for over 90% of all prescriptions that pharmacies fill, they also account for most of the profits pharmacies are able to generate. By suppressing reimbursement rates on generic drugs, the Scheme pushes already struggling pharmacies even further towards the brink.

22.     The ISP Scheme is unlawful under Section 1 of the Sherman Act. Plaintiff brings this action to stop this unlawful conspiracy and to recover treble damages on behalf of itself and others similarly situated.

## II.     PARTIES AND CO-CONSPIRATORS

23.     Plaintiff Community Care Pharmacy LLC ("Community Care") is an independent pharmacy based in Garden City, Michigan. Community Care is owned and operated by pharmacist Maisa Jaimie Hider, who is also a physician. Dr. Hider comes from a family of pharmacists. Her mother, Nadia Hider, was the first Arab-

American woman to earn a Doctor of Pharmacy degree from Wayne State University. She then opened the first independent pharmacy in Dearborn, Michigan in 1989 (known to the Dearborn community as "Nadia's Pharmacy"). In the tradition of Nadia's Pharmacy, Community Care prides itself on building long-term relationships with customers and offering high-quality, personalized care. Among other services, Community Care delivers medication to patients' homes free of charge and provides complimentary transportation to patients' doctors' appointments. Community Care staff are multilingual, with fluency in English, Spanish, and Arabic, enabling them to effectively communicate with their diverse customers (many of whom do not speak English). Staff are also available day or night to answer questions, with Dr. Hider providing her personal cell phone number to many patients with special needs. Dr. Hider acknowledges that running an independent pharmacy like Community Care at a profit is virtually impossible in today's PBM-dominated landscape. But she refuses to close her doors or sell to a big chain because she knows how much her customers and her community would suffer if she did. In addition, Community Care Pharmacy offers free services to help low-income community members apply for federal and state Medicaid and Medicare and runs other community benefit initiatives in the greater Detroit Metro area.

24.    Defendant GoodRx, Inc. is a Delaware corporation with its principal office or place of business at 2701 Olympic Boulevard, West Building, Suite 200, Santa Monica, CA, 90404. It is a wholly owned subsidiary of GoodRx Intermediate Holdings, LLC, which is a wholly owned subsidiary of GoodRx Holdings, Inc. GoodRx, Inc. transacts or has transacted business in this District and throughout the United States.

25.    Defendant GoodRx Holdings, Inc. is a Delaware corporation with its principal office or place of business at 2701 Olympic Boulevard, West Building, Suite 200, Santa Monica, CA, 90404. GoodRx Holdings, Inc. transacts or has transacted business in this District and throughout the United States.

26.     At least four PBMs have participated as co-conspirators with Defendants in the offenses alleged, having performed acts and made statements in furtherance of the conspiracy (the "Conspiring PBMs"). They include the PBMs CVS Caremark, Express Scripts, MedImpact, and Navitus. Collectively, these PBMs manage 64% of all prescription claims made annually, meaning they control 64% of the national PBM Services Market.

27.     CVS Health Corporation—a Delaware corporation headquartered in Woonsocket, Rhode Island—owns and operates CVS Caremark, the largest PBM in the nation. Caremark holds roughly 34% of the U.S. PBM Services Market. CVS Health Corporation also owns and operates the insurer Aetna and the nation's largest retail pharmacy chain, CVS.

28.     Express Scripts is a Delaware corporation headquartered in St. Louis, Missouri. It is the second largest PBM and is responsible for managing approximately 23% of all prescription drug claims in the United States. It is owned by Cigna, a health insurance company.

29.     MedImpact Healthcare Systems, Inc. is a California corporation headquartered in San Diego, California. MedImpact is the largest privately held PBM provider in the United States. It holds 5% of the national PBM Services Market.

30.     Navitus Health Solutions, LLC, is a Wisconsin limited liability company headquartered in Madison, Wisconsin. On information and belief, Navitus controls around 1.7% of the U.S. PBM Services Market. Navitus is co-owned by Costco Wholesale Corporation and SSM Health, a Catholic healthcare system in the Midwest.

## III.     JURISDICTION AND VENUE

31.     This case arises under Section 1 of the Sherman Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 & 26). Plaintiff seeks (1) treble damages for its injuries, and those suffered by members of the proposed Class, resulting from Defendants' anticompetitive conduct; (2) to enjoin Defendants'

anticompetitive conduct; and (3) such other relief as is afforded under the laws of the United States.

32.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and § 1337(a) (antitrust), and 15 U.S.C. § 15 (antitrust). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the proposed Class is a citizen of a state different from that of the Defendants.

33.     This Court has personal jurisdiction over Defendants GoodRx, Inc. and GoodRx Holdings, Inc. because each of their principal places of business is in this District; they transact business throughout the United States, including in this District; and they are engaging in the alleged antitrust conspiracy, which has a direct, foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.

34.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and under the federal venue statute, 28 U.S.C. § 1391, because Defendants GoodRx, Inc. and GoodRx Holdings, Inc. maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District. No other forum would be more convenient for the parties and witnesses to litigate this case.

## IV.     FACTUAL BACKGROUND

### A.     PBMs: The Powerful Middlemen at the Center of the U.S. Prescription Drug Supply Chain.

35.     PBMs sit at the center of the complex pharmaceutical distribution chain that delivers medicines from drug manufacturers to patients in the United States.

1.    *PBMs negotiate with retail pharmacies to secure pricing discounts for health plans.*

36.    PBMs typically do not sell their services directly to patients. Instead, PBMs are retained by TPPs, such as large commercial insurance companies, to perform certain administrative functions. The TPPs that retain PBMs have committed to provide prescription-drug benefits to their enrolled members; they include commercial insurance companies but also employers or labor organizations that sponsor health-insurance plans, as well as various public insurance programs that offer pharmacy benefits to members.

37.    Among other services, PBMs are retained by TPPs to negotiate prices and other contract terms with pharmacies across the nation; these negotiated price schedules dictate what TPPs and their members will pay pharmacies for prescriptions. PBMs are also retained to process or "adjudicate" pharmacies' claims for reimbursement from TPPs based (in theory) on those pre-negotiated prices.

38.    U.S. prescription-drug spending reached $722.5 billion in 2023. Of that amount, approximately 85% was paid by TPPs rather than patients. Given this reality, outpatient pharmacies rely on reimbursements from TPPs to stay in business. When an insured patient fills a prescription, the dispensing pharmacy typically collects only a small portion of the cost of the drug from the consumer at the point of sale, usually in the form of a "co-pay" or "co-insurance" contribution. The TPP (through its retained PBM) is then obligated to pay the balance of the negotiated pharmacy reimbursement rate, which is supposed to cover the Ingredient Cost and a small Dispensing Fee.

2.    *PBMs compete in the input market for pharmacy services to build pharmacy networks.*

39.    To attract and retain TPP clients, PBMs must build networks of retail pharmacies where health-plan members can easily and conveniently get their prescriptions filled. Under normal market conditions, PBMs compete against each other

to recruit pharmacies into their networks, offering inducements such as superior re-imbursement rates, increased patient volume, and higher dispensing fees. PBMs are thus horizontal competitors in the input market for Network Pharmacy Services. A PBM that is unable to attract pharmacies to its network will risk losing clients, as health plans select PBMs based in part on the adequacy of their retail pharmacy net-works.

40.    Pharmacies choose which networks to join based primarily on the reim-bursement rates PBMs offer. In general, pharmacies will accept lower reimbursement rates from PBMs that represent significantly more patients because those PBMs can offer more future business volume. Smaller PBMs (which represent fewer patients) cannot promise pharmacies as much future business, and thus do not qualify for the same volume discounts. A smaller PBM seeking to attract pharmacies to its network must therefore offer higher reimbursement rates than the larger PBMs, or else suffer competitive harms in the output market for PBM services.

### 3.    *PBM-negotiated reimbursement rates are set forth in network agreements with participating pharmacies.*

41.    PBMs' negotiations with pharmacies largely dictate the price of pre-scription drugs and how they can be accessed by hundreds of millions of Americans. Generally, health-plan members who have already met their plan's annual deductible pay only a portion of their PBM's negotiated pharmacy reimbursement rate as spec-ified by their plan's co-payment or co-insurance schedule; the remainder is paid by their plan.

42.    The rates of reimbursement negotiated between a PBM and its in-net-work pharmacies are set forth in network agreements. These rates (and many other aspects of these agreements) are confidential and competitively sensitive.

43.    These Negotiated Rates are generally expressed not in specific dollar amounts for specific drugs, but as formulas, which are then used to calculate the pharmacy reimbursement rate for a particular prescription. These formulas rely on a

set of input factors known as "reference prices." A typical network agreement will state that the PBM will reimburse the pharmacy the lowest of the following reference prices:

> a) Average Wholesale Price ("AWP") minus a negotiated discount percentage, plus a dispensing fee;
>
> b) the Maximum Allowable Cost ("MAC"), plus a dispensing fee;
>
> c) the Ingredient Cost submitted by the Provider, plus a dispensing fee;
>
> d) the Usual and Customary Price ("U&C") (i.e., the pharmacy's retail list price); or
>
> e) the pharmacy's Submitted Claim Amount.

44.    The first two listed reference prices in the above example are often referred to as "Negotiated Rates" as they are the product of negotiations between PBMs and pharmacies. Because Negotiated Rates are almost always lower than the other reference prices, the vast majority of generic prescriptions are reimbursed based on one of the first two reference prices.

45.    The Usual & Customary (U&C) price is not negotiated; it's the retail or cash price for the drug set unilaterally by the dispensing pharmacy. Pharmacies' U&C prices are intended to reflect the amount they would charge to a cash-paying customer without insurance or any discount card. The U&C price is almost never lower than the Negotiated Rates, so is rarely the algorithmically selected reference price.

46.    The Submitted Claim Amount is also not a negotiated rate; it's the full reimbursement amount requested from the PBM by the pharmacy, typically based on the U&C price. The Submitted Claim Amount is almost never lower than the Negotiated Rates, so is rarely the algorithmically selected reference price.

47.    "Maximum Allowable Cost" is a commonly used metric designed by PBMs to control drug costs for their TPP clients by establishing an ostensibly fair but competitive unit price at the product level, regardless of supplier. Some sources estimate that roughly 82% of generic purchases are transacted with pharmacies at MAC prices. PBMs set their own MAC prices, which they keep as part of MAC lists. There is little transparency in how PBMs set their MAC prices, although in theory, the MAC price should account for market realities such as the cost to the pharmacy of acquiring the drug. In general, a PBM is free to change its MAC price lists any time it chooses. PBMs often maintain hundreds of MAC lists for various pharmacies and update them as frequently as daily or weekly. Because PBM reimbursement rates are defined formulaically—and because MAC prices can be changed by the PBM unilaterally at any time—pharmacies face significant uncertainty regarding how much compensation they will ultimately receive for generic drugs.

48.    Historically, MAC lists are proprietary to each PBM and treated as highly confidential. However, under the ISP Scheme, GoodRx management has told industry analysts that GoodRx is now acquiring MAC information from the Conspiring PBMs and compensating them in return out of its profits from the ISP Scheme.

### 4.    The PBM industry is highly concentrated.

49.    One of the most critical services that PBMs offer their TPP clients is claims adjudication, which is sometimes called claims processing. This is the process of determining in real time at the pharmacy counter (1) whether an individual has prescription-drug benefits, (2) whether the drug in question is covered, (3) the total reimbursement rate to be paid to the pharmacy based on existing contracts, and (4) the portion of that pharmacy reimbursement rate that the pharmacy is to collect directly from the consumer.

50.    Although there are estimated to be 66 PBMs in the United States, few of them have the technology or infrastructure required to handle real-time claims adjudication. As a result, smaller PBMs function largely as benefits consultants and

typically contract with larger PBMs to perform claims adjudication on their behalf. These same few large PBMs are responsible for most pharmacy-contract negotiations. This has left the PBM industry highly concentrated when it comes to the key, relevant functions.

51.    The FTC measures PBMs' market share by considering the percentage of all "prescription claims managed" by each PBM. By the FTC's measure, after decades of mergers and acquisitions, the three largest PBMs—Caremark, Express Scripts, and OptumRx (the "Big Three")—now manage about 80% of all prescription claims in the United States. If these Big Three PBMs were standalone companies, each would rank among the 40 largest companies in the United States by revenue. The Big Three PBMs, together with the next three largest PBMs—Humana Pharmacy Solutions, MedImpact, and Prime Therapeutics—manage roughly 94% of prescription-drug claims in the United States.

52.    As illustrated in the chart below, Caremark accounts for roughly 34% of all prescriptions filled, followed by Express Scripts at 23%, and Optum Rx at 22%. Humana accounts for 7% of the market, followed by MedImpact at 5% and Prime at 3%. Navitus controls about 2% of the PBM Services Market.



Figure 4. PBM Services Shares, 2016-2023[59]
(% of total equivalent prescription claims managed)



53.    PBMs use their market power and negotiating leverage to impose low reimbursement rates and other onerous contract terms on unaffiliated pharmacies.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> 5. *Vertically integrated PBMs steer business to their affiliated pharmacy chains at the expense of independent pharmacies.*

54. The Big Three PBMs (and many of the smaller ones) are also vertically integrated with other segments of the drug supply chain, including major health insurers and pharmacy chains. For example, CVS Health owns Aetna (the third-largest health-insurance company by national market share), Caremark (the largest PBM), CVS Pharmacy (the largest retail pharmacy), and CVS Specialty (the largest specialty-drug pharmacy). The Cigna Group owns Cigna Healthcare (the fourth-largest insurer), Express Scripts (the second-largest PBM), and Accredo (the second-largest specialty-drug pharmacy).



Figure 1. PBMs: Ownership and Vertical Integration[16]

55. As a result of PBMs' vertical integration with pharmacy chains, PBMs are incentivized to steer patients to their own affiliated pharmacies, even when it's not in the best interest of their TPP clients or those clients' members. One way PBMs give preference to their affiliated pharmacies is by creating "preferred" pharmacy networks consisting of their vertically integrated pharmacies. They then relegate

CLASS ACTION COMPLAINT
Case No.: 2:24-cv-9490

independent and affiliated pharmacies to a less preferred status, requiring patients to shoulder higher co-pays to fill their prescriptions there.

56.    PBMs can also pay their own affiliated pharmacies higher reimbursement rates than unaffiliated ones, lining their pockets at the expense of payors and patients. In 2022, commercial health plans reimbursed affiliated pharmacies roughly 80–90% more than unaffiliated pharmacies for two cancer drugs studied by the Federal Trade Commission (generic Zytiga and generic Gleevac). A June 2024 study prepared for the Washington State Pharmacy Association also documented substantially higher reimbursement rates for generic drugs filled by PBM-affiliated mail-order pharmacies than by unaffiliated pharmacies.

>    *6.    PBMs have decimated independent pharmacies, depriving Americans across the nation of pharmacy access.*

57.    An independent pharmacy is a retail pharmacy that is not directly affiliated with any chain of pharmacies and is not owned by a publicly traded company. Many independent pharmacies are pharmacist-owned. These pharmacies often offer specialized services such as custom compound prescriptions, medication therapy management, and home delivery.

58.    Independent pharmacies are essential healthcare providers. This is particularly true in communities with elderly populations, limited transportation options, or language barriers where personalized care is crucial. In rural and medically underserved communities, independent pharmacies are often the sole provider of medication counseling and management as well as the main source for immunizations and rescue medications like EpiPens for allergic reactions.

59.    Until the 1980s, independent pharmacies were the norm in the United States, with just under 40,000 such establishments spread across the country. Since 1980, the number of independent pharmacies has plummeted nearly 50%, leveling off at about 20,000 locations since 2000.

60.     PBMs have played a primary role in the demise of independent pharmacies. As described above, industry consolidation has given the few largest PBMs enormous leverage over independent pharmacies in price negotiations. PBMs use their market power to demand massive discounts from independent pharmacies, steering business to their affiliated pharmacies instead. The buying power of PBMs has been further magnified by their vertical integration with health insurers and pharmacies, including retail, mail-order, and specialty pharmacies.

61.     In many instances, independent pharmacies have been replaced by chain pharmacies, the biggest of which is CVS. CVS entered the pharmacy business over 50 years ago but saw its biggest period of growth after it merged with the PBM Caremark in 2007. Between 2013 to 2022, the number of CVS-owned retail pharmacies increased by 28%, from about 7,600 locations to over 9,700 locations. During the same time period, other retail pharmacies declined by 7% overall (from roughly 55,200 locations to 51,400 locations) and by 10% within rural areas (from about 11,100 to 10,000).

62.     Vertically integrated PBMs like CVS Caremark use their market power and negotiating leverage to impose low reimbursement rates and other onerous contract terms on independent pharmacies, whom they view as "competitors" of their affiliated CVS drug stores. Today, reimbursement rates for independent pharmacies are so low that on an estimated 30–40% of prescriptions, the pharmacy loses money. Pharmacies thus depend upon receiving Negotiated Rates on the higher end of the distribution for a majority of prescription fills to compensate for losses on other drugs with Negotiated Rates that are below the pharmacy's cost.

63.     These financial losses are further compounded by various additional fees PBMs impose on independent pharmacies after drug claims are processed and paid—including so-called "direct and indirect remuneration fees," clawback fees collected after the point of sale, ostensibly for the "benefit" of using PBMs' claim processing services. Independent pharmacies are forced to pay these fees and accept

increasingly unfavorable and arbitrary terms from the major PBMs because, if they opt out, they will lose the ability to do business with the more than 60% of covered lives the major PBMs represent.

64.     Such tactics have caused, and continue to cause, thousands of independent pharmacies to go out of business. About 7,000 drugstores in the U.S. have closed since 2019, 54% of which were independent. In 2023 alone, over 300 independent pharmacies closed their doors. It is estimated that there will be even more closures in 2024, with nearly a third of remaining independent pharmacies at risk of going out of business.

65.     Closures of local pharmacies affect not only small business owners and their employees, but also their communities and patients. In many rural and medically underserved urban areas, independent pharmacies are the primary healthcare option for Americans, who depend on them to get flu shots, EpiPens, and vaccines.

66.     The loss of independent pharmacies has hit rural America particularly hard, turning thousands of communities into "pharmacy deserts." Between 2013 and 2022, about 10% of independent retail pharmacies in rural America closed. Today, over 2.4 million rural residents live in pharmacy deserts, meaning that they do not have access to any pharmacy within 10 miles.

67.     Pharmacy deserts are also now common in U.S. cities, with one study showing that a third of all neighborhoods in major U.S. cities have become pharmacy deserts. Urban communities that are predominantly Black and Hispanic are most likely suffer from lack of pharmacy access. All told, a full 40% of U.S. counties are pharmacy deserts today.

68.     Limited access to pharmacies leads to patient non-adherence to medication regimens, resulting in poor health outcomes and higher medical costs along with increased hospitalizations and emergency department visits. Non-adherence contributes significantly to healthcare system waste in the United States, with approximately

$100 to $300 billion spent annually on avoidable health care costs due to non-adherence.

### 7. *PBMs drive up retail drug prices.*

69. While PBMs claim to reduce prescription drug costs, their negotiating tactics with pharmacies systemically inflate retail drug prices for consumers while driving down revenue at independent pharmacies.

70. In particular, and as noted above, most network agreements between PBMs and pharmacies include provisions giving PBMs the right to pay pharmacies the "lesser of" various references prices, including (a) the Negotiated Rate for each dispensed drug (which, for generics, is often based on a variable MAC price set unilaterally by the PBM ) or (b) the U&C rate (the price the pharmacy charges cash-paying customers for each drug). Because these "lesser of" provisions protect PBMs from being charged more than other kinds of buyers by pharmacies—namely, cash-paying customers—they are considered "most-favored nation" provisions or "MFNs."

71. Pharmacies have unilateral control over their U&C rates, but no control over PBMs' MAC prices, which are almost always lower. However, given the variability and opacity of MAC pricing, pharmacies often do not have any idea what reimbursement rate they'll receive when they dispense a particular drug. Thus, independent pharmacies—which operate on razor thin margins—are incentivized to set their U&C prices high for *all* drugs to blunt the impact of MAC variability and ensure they will obtain at least the Negotiated Rates from PBMs in connection with all prescriptions dispensed to insured patients (the majority of their customers).

72. High U&C prices mean high costs for any consumers purchasing their medications out-of-pocket. PBMs' agreements with pharmacies also deter pharmacies from giving special discounts to uninsured, cash-paying consumers on an ad hoc basis (as physicians often do), either because PBMs' agreements with pharmacies flatly forbid discounts, or because PBMs could then use these discounted rates as the

pharmacy's U&C price when they perform their "lesser of" reimbursement rate calculations.

73.    The upshot is that PBMs' market power and negotiation tactics vis-à-vis pharmacies have caused the U&C price of all drugs to inflate, to the detriment of all consumers, and uninsured consumers in particular.

**B.    The Emergence of Prescription Drug Discount Programs.**

*1.    Pharmacy savings clubs.*

74.    In the 1990s, some pharmacy chains created subscription-based "savings clubs" to help uninsured customers deal with PBM-fueled high U&C prices. Dues-paying club members would receive discounts off the pharmacy's U&C prices, so long as they paid for the whole cost of the drug themselves (rather utilizing any insurance benefits).

75.    Pharmacy savings clubs help patients afford the medications they needed and enabled pharmacies to tap into additional revenues from consumers who were willing to pay cash for prescription drugs (particularly generics) but were unwilling or unable to cover inflated U&C prices.

76.    Pharmacy savings clubs allowed pharmacies to reach direct-pay customers on their own terms, as each pharmacy could set its own discount rates and eligibility requirements, and for their own benefit, as club proceeds did not have to be shared with PBMs or any other third-party intermediaries. These clubs also enabled pharmacies to build customer loyalty, as members would typically continue to frequent the pharmacy even after obtaining insurance.

*2.    PBM discount cards.*

77.    In the early 2000s, some PBMs launched their own discount card programs to compete with pharmacy savings clubs for direct-pay business, including the CVS Health Savings Pass, the Citizens Health Card (administered by Express Scripts), and the Advance-PCS Prescription Plan. These PBM-sponsored initiatives employed external discount cards which consumers could present at pharmacies.

Pharmacies that accepted these cards agreed to honor the discounts offered by the sponsoring PBM and pay a remittance to the PBM for directing the sale their way. Such remittances reflected a difference—or "spread" kept by the PBM—between (a) what the payor (i.e., the patient) paid for the prescription, and (b) the net sums that the pharmacy earned for dispensing the drugs.

78.    Initially, only larger pharmacies accepted PBM discount cards because, after honoring the discounts and sharing a portion of the proceeds with the PBM, pharmacies made little to no money on these transactions. Eventually, however, most PBMs began requiring in-network pharmacies to accept their discount cards, meaning pharmacies would have to weigh the pros and cons of this requirement when negotiating their network agreements with PBMs.

79.    Customers who pay cash for drugs—either because they do not have insurance or because they've elected not to use their benefits on a given transaction—are known as "direct-pay" (or "cash-pay") customers. As health plans with high deductibles (as well as high co-pays) became more prevalent, the number of direct-pay customers grew. More and more PBMs wanted a piece of the pie, and PBM discount cards proliferated. These discount cards allowed more PBMs to tap into the growing direct-pay, "business to consumer" (B2C) revenue stream, a revenue stream that would otherwise be captured by pharmacies.

80.    Discount cards also allowed PBMs to keep drug costs down for their TPP clients, who benefitted when members elected not to use their prescription drug benefits and instead paid cash. When a traditional B2C discount card is used to purchase medications, the insurer doesn't have to pay anything. Drug costs are covered entirely by the patient, on an out-of-pocket basis, and their spending on the transaction typically does not count toward the patient's deductible.

81.    PBM discount cards competed directly with pharmacy savings clubs in the market for direct-pay customers. But eventually, PBMs and the TPPs they served set out to eliminate the competition posed by pharmacy-sponsored clubs. Over the

last decade, TPPs or their members brought several lawsuits against pharmacies who operated discount clubs, claiming that the discounts offered to club members could be treated as pharmacies' U&C prices (meaning they could be factored into PBMs' "lesser of" reimbursement calculations). By 2016, such litigation had largely eliminated pharmacy savings clubs.

> ### 3. *GoodRx: A discount platform that aggregates PBM-negotiated rates.*

82.     In 2011, a start-up called GoodRx launched a new kind of B2C discount card program. Whereas other discount cards were sponsored by a single PBM and reflected only the discounts offered by that PBM, GoodRx's model was to aggregate negotiated discount rates from a variety of PBMs and market the lowest prices to potential direct-pay consumers.

83.     GoodRx's original B2C discount card model took advantage of the variable pricing of drugs in the United States. Drug prices are the product of constant, ongoing negotiations between PBMs and pharmacies, which dictate what third-party insurers and their members pay pharmacies and also establish direct-to-consumer prices. These Negotiated Rates can differ dramatically across PBMs, with generic medications subject to the most price fluctuation because of the variable nature of MAC prices. Negotiated Rates can also differ across pharmacies, with larger pharmacy chains (which have more market power) demanding higher pharmacy reimbursement rates from PBMs. Depending on the rates PBMs have negotiated with particular pharmacies, two consumers might pay wildly different prices for identical prescriptions in the same geographic area. The upshot of all this variation is that if consumers had the ability to know and leverage the Negotiated Rates of various PBMs at different pharmacies in their area, they could reduce their prescription costs. But insured consumers would have to eschew their plan benefits and pay entirely out-of-pocket to do so.

84.     GoodRx's B2C discount card program provides consumers the ability to engage in this kind of rate-comparison shopping. GoodRx partners with over a dozen PBMs to aggregate information on pharmacy reimbursement rates. These PBMs (which include the four Conspiring PBMs) collectively control over 95% of all prescription-drug claims. Each of GoodRx's partner PBMs agrees to share its Negotiated Rates with GoodRx, even though these rates are competitively sensitive and subject to contractual confidentiality provisions.

85.     GoodRx "aggregates" and "normalizes" all this PBM data—which the company claims amounts to "over 150 billion prescription pricing data points every day." It then uses its patented algorithm to determine the lowest available price on any given date for a particular drug in a particular geographic area. Through GoodRx's "price comparison platform," the company presents users with "curated, geographically relevant prescription pricing" selected by GoodRx's algorithm from among the "negotiated rate[s] provided by one of [GoodRx's] PBM partners." Once a user has selected the lowest rate for their prescription available at their preferred local pharmacy, GoodRx displays a "GoodRx code" to the user on its mobile app or website interface. This code reflects "the most favorable prices at the pharmacies based on user locations" (i.e., the "GoodRx Rate"), as illustrated in the screen captures below.



86.     Consumers can take advantage of the GoodRx Rate by presenting the GoodRx discount card at participating pharmacies. But there's a catch: they must be willing to pay cash to fill their prescriptions, without utilizing any insurance benefits

CLASS ACTION COMPLAINT
Case No.: 2:24-cv-9490

they might have. As GoodRx's website states: "Keep in mind you cannot use GoodRx and insurance at the same time."

87.    For direct-pay customers using the GoodRx discount card, the Leveraged PBM collects a per-prescription processing fee from the pharmacy each time a customer buys a drug using the card. Per its agreement with GoodRx, that PBM then shares a cut of those fees with GoodRx, either as a fixed fee or a percentage of the fee paid by the pharmacy to the PBM.

88.    As such, the more volume that goes through the GoodRx platform, the more revenue GoodRx generates. GoodRx claims to obtain, on average, a "15-16%" cut of the overall drug price. These fees constitute 73% of GoodRx's revenues.

89.    GoodRx's business model proved wildly profitable. In 2023, its gross profit margin was 77.33%. In 2019 alone, GoodRx collected $364 million in fees on $2.5 billion in consumer prescription drug spending through its platform, a 15% commission. And in the first three months of 2024, GoodRx brought in over $145 million in prescription transactions revenue.

90.    Between 2017 and 2022, traditional B2C discount-card utilization increased by nearly 60%. As of 2021, pharmacy discount cards accounted for 5.4% of all prescription adjudications, up from 3.3% in 2017. That growth was driven primarily by GoodRx, which grew from 0.5% to 2.5% of all prescription adjudications in the same time period.

## V.    THE GOODRX ISP SCHEME

91.    This action does not challenge GoodRx's traditional discount-card business, but rather a new GoodRx business initiative, called the Integrated Savings Program ("ISP"). As detailed below, the ISP Scheme makes large amounts of CSI available to competitor PBMs who also participate in the Scheme and agree to allow GoodRx to set rates of reimbursement for them based on this CSI. GoodRx has amassed and continues to amass this database of CSI through the GoodRx Information-Exchange Network, and it includes PBMs' Negotiated Rates of

reimbursement for generic drugs. The origins and nature of the ISP Scheme are described below.

**A. The Origins of the Scheme: GoodRx's Discount Card Empire Begins to Crumble.**

92. By 2019, GoodRx had grown into a highly lucrative company, vaunted for its innovation. When the company went public in 2020, it was valued at nearly $18 billion, more than six times the valuation it had commanded during its last private fundraising only a few years prior.

93. Much of this success stemmed from GoodRx's popularity with insured consumers. But these individuals were not the company's intended customer base. When GoodRx launched in 2011, it marketed itself as a program for uninsured consumers who do not benefit from any PBM-negotiated rates for prescribed medications and must instead pay inflated U&C prices. GoodRx claimed to provide this economically vulnerable pool of customers with a way to access discounted rates similar to those made available to insured individuals—for free. And it claimed to offer pharmacies a way to bring in new business from people who might not otherwise purchase any medications at all due to cost.

94. Over time, many insured consumers began to flock to GoodRx as well. This was largely a function of increases in out-of-pocket costs for insured consumers, as insurers and PBMs began to shift more of the cost burden for prescription drugs onto patients in the form of higher co-pays and co-insurance requirements. Increasingly, insured individuals realized it was often cheaper to pay cash for medications at the GoodRx Rate than it was to use their plan benefits once the required out-of-pocket contributions were factored in. This was particularly true for high-deductible plan members, who must pay the full cost of their prescription drugs until their annual deductibles are met.

95. The influx of business from insured customers benefitted GoodRx's bottom line tremendously. But behind the scenes, GoodRx's increasing popularity

among insured consumers was sowing the seeds of a looming crisis. GoodRx's discount card business depends on large numbers of retail pharmacies voluntarily accepting the GoodRx discount card. Yet pharmacies often lose money on GoodRx discount card transactions after paying the required fees to the Leveraged PBM. In the early days of GoodRx, pharmacies were willing to absorb these losses to help uninsured patients (a relatively small pool of consumers) and to bring in new customers. But this goodwill was premised on the proportion of GoodRx discount card transactions remaining relatively low, and users of the GoodRx card being mostly uninsured patients who otherwise might not purchase any medicines at all. After large numbers of insured patients began using GoodRx, the benefit of accepting the card for most pharmacies evaporated: each time an insured patient uses a GoodRx discount card, the pharmacy does not bring a new customer through the door; it simply loses money on a sale it likely would have made anyway. Since 2016, over 80% of GoodRx's prescription transactions have consisted of repeat purchases by an existing GoodRx consumer.

96.    As GoodRx's user base tilted toward insureds, pharmacies' willingness to accept the GoodRx card waned, and many pharmacies began opting out of accepting the GoodRx discount card altogether. This problem reached a tipping point in 2022, when Kroger—which accounted for a huge share of GoodRx's business—announced it would no longer accept the GoodRx card. The loss of Kroger caused GoodRx's stock value to plummet by more than 25% overnight.

97.    GoodRx's increasing popularity with insured patients also brought unwanted regulatory scrutiny to the PBM industry, posing another threat to the company's long-term viability. The fact that so many insured patients found it cheaper to use the GoodRx discount card than their own insurance plans undermined the narrative that PBMs offered a valuable service to health plans and patients. After all, why allow PBMs to manage prescription drug benefits at all—extracting billions of dollars in the process—if they do not help make drugs more accessible?

98.    Financial tensions also arose between GoodRx and its partner PBMs. Early in the history of pharmacy discount cards, many of GoodRx's partner PBMs were also its horizontal competitors in the market for cash-pay customers. Initially, many PBMs sponsored their own B2C discount cards, each aiming to carve out a share of the cash-pay market for prescription drug purchases by uninsured or other cash-pay consumers. But as GoodRx's market share grew, it was able to insert oner-ous contractual provisions into its agreements with partner PBMs that were intended to "restrict the ability of PBMs to compete with [GoodRx] and solicit [its] consum-ers" through those PBMs' rival discount cards. Then, as even more transactions were being mediated through GoodRx's discount card rather than through patients' plan benefits or competing discount cards, GoodRx sought to extract higher fees from the rival-turned-partner PBMs whose rates were being leveraged. But many PBMs balked at the prospect of paying even more money under restrictive contract terms to a company that merely aggregates the PBMs' own Negotiated Rates—and which would disappear overnight if PBMs decided to stop sharing their payment data. Some PBMs threatened to leave the GoodRx ecosystem altogether.

99.    These issues made increasingly clear to GoodRx executives that the company's original discount card model—which was premised on pharmacies' vol-untary acceptance of an external, consumer-facing discount card—might not be via-ble long-term. This reckoning set the stage for GoodRx to begin orchestrating the ISP price-fixing conspiracy.

**B.    GoodRx Develops Its "Integrated Savings Program."**

100.    In 2021, less than a year after going public, GoodRx began to lay the groundwork for the Scheme alleged herein.

101.    On July 7, 2021, GoodRx acquired a technology platform called RxNXT LLC. RxNXT enabled GoodRx to rapidly exchange claims data and reimbursement-rate information, both considered CSI, with PBMs.

102.   This new technology would enable GoodRx to execute what it called the "Integrated Savings Program," the program at the heart of this Complaint. Under the ISP, GoodRx's "price comparison technology"—a pricing algorithm and an associated database—"is . . . integrated with" participating PBMs' internal claims processing platforms, so that each PBM's plan members "won't have to do this comparison [of out-of-pocket prescription costs] themselves." Around the same time, GoodRx announced that it was launching a new "B2B2C [i.e., business-to-business-to-consumer] vertical."

103.   As a result of this integration, whenever one of the Conspiring PBMs' "covered lives" would fill a generic drug prescription using their insurance benefits (i.e., without using the GoodRx discount card), GoodRx's ISP platform would "automatically compare their benefit and the GoodRx price and then deliver the lowest one." If the ISP Rate was lower, it would be applied automatically as part of the patient's plan benefit, and the amount spent on the drug is applied to the member's deductible.

104.   For each ISP transaction where the ISP Rate is applied, the pharmacy would be required to pay a "processing fee" of between $7 and $10. On information and belief, GoodRx and the Conspiring PBMs involved in the transaction share these fees among themselves, profiting at the expense of independent pharmacies.

105.   The ISP was designed to solve GoodRx's growing existential problems in three ways. *First*, it eliminated pharmacies' ability to opt out of transacting with GoodRx, since the GoodRx ISP Rate would be automatically calculated and applied as part of an insured patient's health-plan benefits without the need for any external GoodRx card. *Second*, insured patients would no longer have occasion to learn that their PBM had been unable to secure the best drug prices available; they would simply receive the lowest rate negotiated by *any* PBM automatically through their health plan. *Third*, the proposal would increase the total number of transactions mediated through GoodRx, as its pricing algorithm would be applied to every generic-

drug transaction filled through benefits administered by any Conspiring PBM. In-deed, GoodRx estimates that some 500 to 600 million claims will be subject to the ISP each year, up from 100 million under its traditional discount-card program.

106.   Participating PBMs also stood to gain from GoodRx's ISP scheme. Smaller PBMs would be able to take advantage of the negotiated reimbursement rates secured by larger PBMs in the input market for Network Pharmacy Services. The coordination between these competing PBMs, facilitated by GoodRx, would thus re-sult in an artificially suppressed reimbursement rate for the pharmacies. Furthermore, the curtailment of competition for pharmacy services among PBMs would drive down all reimbursement rates below competitive levels over time, benefiting all PBMs through their collective monopsony power.

107.   Additionally, GoodRx would receive clawback fees from dispensing pharmacies every time the ISP Rate was leveraged on behalf of a patient insured by a Conspiring PBM, which, on information and belief, it would then share with the Conspiring PBMs. Thus, on information and belief, these fees reflect a gap (or "spread") between the price paid by the TPP to the Primary PBM and the amount the PBM passes on to the pharmacy for dispensing it.

108.   Retaining spreads as profit has been an important revenue stream for PBMs. In recent years, though, spread retention has been criticized for raising drug prices and harming pharmacies, leading some state regulators and many TPPs to re-quire PBMs to "pass through" all negotiated discounts and fees in full to the payor, precluding spread retention. The ISP Scheme is an end-run around these contractual and statutory protections, allowing PBMs to reintroduce spread retention into their business models without violating provisions in their contracts with payors requiring the PBM to pass through all discounts. That's because, for each generic-drug pre-scription that is subject to the ISP Scheme, the cartel member that retains the spread (i.e., the clawback fee from the pharmacy) is not the Primary PBM. Instead, the fee is collected by GoodRx, which has no contractual relationship to the PBM's third-

party payor. On information and belief, GoodRx then shares its profits from these fees with the Conspiring PBMs involved in the transaction.

109.   Of course, there is one glaring problem with GoodRx's ISP Scheme—it constitutes naked price fixing by horizontal rivals. Through the Scheme, participating PBMs agree (1) to share real-time CSI, including pricing data with one another, using GoodRx as a conduit, and (2) to always pay no more than the *lowest* rate negotiated by *any* PBM in the GoodRx Information-Exchange Network. Instead of outbidding one another's negotiated pharmacy reimbursement rates, rival PBMs agree to pay pharmacies no more than the lowest rate set by their competitors, curtailing competition between themselves for pharmacy business. This is just price-fixing in two steps: anticompetitive sharing of CSI among horizontal rivals, followed by their agreement not to outbid and instead pay the lowest rate any of them has obtained.

### C.   GoodRx Invites PBMs to Participate in Its ISP Scheme, and They Accept.

110.   On information and belief, GoodRx began pitching the ISP Scheme to its partner PBMs sometime in 2022.

111.   Between November 8, 2022, and October 13, 2023, GoodRx announced deals with several PBMs. Pursuant to these deals, a participating PBM would integrate GoodRx's pricing technology into its in-house pharmacy-benefit plans on or around January 1, 2024, and sooner for some PBMs. This was a sudden departure from prior practice, which several competitors undertook on or around the same time, implying coordination.

### *1.   November 2022: Express Scripts joins the cartel.*

112.   On November 8, 2022, GoodRx announced the first of its ISP partnerships with the nation's second largest PBM, Express Scripts. The deal would go into effect in early 2023, meaning Express Scripts joined the ISP Scheme earlier than any other PBMs. Under the agreement, beneficiaries of plans managed by Express Scripts would "automatically get the lowest out-of-pocket cost" on generic drugs "by

comparing the GoodRx price with the price from their Express Scripts PBM plan" and "[a]ll spending will be applied to any deductible."

113.   This deal required Express Scripts not to outbid any of its competitors on reimbursement rates paid to pharmacies for generic drugs and to and share its CSI with rivals through GoodRx as a conduit.

114.   GoodRx co-founder and then co-CEO Trevor Bezdek described the arrangement as follows:

> Under this innovative program, eligible Express group members will automatically access GoodRx prices as part of their pharmacy benefit. This means an eligible Express Scripts member will have seamless access to GoodRx prices for eligible generic medication in instances where that price is lower than their benefit price. Importantly, this keeps visibility of the eligible members' GoodRx claims within the pharmacy benefit, and it enables out-of-pocket claims [to count toward a] member[']s deductible.… We believe this innovative collaboration is a strong validation of … the deep trust consumers have in our technology powered by last year's acquisition of RxNXT. Next, this collaboration creates a new distribution channel that we believe expands our market opportunity and represents a way to efficiently gain many incremental users.

2.   *July to September 2023: Caremark, Navitus, and MedImpact join the cartel.*

115.   On July 12, 2023, GoodRx announced an identical arrangement with another of the Big Three PBMs, Caremark, which was set to go into effect January 1, 2024. It required Caremark not to out-bid any of its competitors on reimbursement

rates paid to pharmacies for generic drugs and to and share its CSI with rivals through GoodRx as a conduit.

116.   On September 13, 2023, GoodRx announced that it had inked the same deal with the PBM MedImpact, to go into effect January 1, 2024. This deal required MedImpact not to outbid any of its competitors on reimbursement rates paid to pharmacies for generic drugs and to and share its CSI with rivals through GoodRx.

117.   And on October 12, 2023, GoodRx announced the same arrangement with the PBM Navitus Health Solutions. This deal went into effect immediately, with an expanded roll-out to cover more of Navitus's insureds, planned for January 2024. It required Navitus not to out-bid any of its competitors on reimbursement rates paid to pharmacies for generic drugs and to and share its CSI with rivals through GoodRx.

118.   In its 2023 Annual Report, GoodRx reported:

> Our … priority has been to hone our growth plans for our
> core prescription transactions offering which includes ex-
> tending the benefit of GoodRx to commercial insurance
> programs, or 'funded plans'. We've done this through our
> Integrated Savings Program, or ISP, with PBM partners
> like CVS Caremark, Express Scripts, MedImpact and
> Navitus who aggregate demand for our prescription dis-
> counts. We are driving real value with payers and their
> members by seamlessly lowering the cost of their prescrip-
> tions automatically at the point of sale. We are quickly be-
> coming a leader in the commercial market for integrated
> benefits, and while our programs are currently only availa-
> ble to a subset of our partner PBMs' eligible members,
> these PBMs cover over 60% of eligible U.S. lives so the
> opportunity could be significant. The early traction on this
> program is encouraging and we look forward to continuing

to ramp it over time by working to add more PBMs and types of prescription transactions to the program.

## VI.    DIRECT AND INDIRECT EVIDENCE OF AN UNLAWFUL HORIZONTAL CONSPIRACY

### A.    Direct Evidence of a Horizontal Agreement.

119.    Each of the Conspiring PBMs has agreed contractually with GoodRx to participate in the ISP. On information and belief, these contracts provide that the PBM will agree to pay dispensing pharmacies the lowest amount obtained by any PBM in GoodRx's Information-Exchange Network for generic drugs as part of their plan benefits. Because these contracts explicitly require each PBM to cap its generic-drug pharmacy-reimbursement rates at the lowest negotiated rate any rival PBM has agreed to pay, they constitute direct evidence of a horizontal conspiracy among PBMs.

120.    Additional direct evidence of a horizontal conspiracy among the PBMs can be found in public statements issued by GoodRx (including those quoted above) and by each of the Conspiring PBMs admitting to both the existence and nature of the ISP Scheme. For instance, the press releases announcing each new partnership between GoodRx and a Conspiring PBM admit both the PBM's agreement to share CSI and its agreement to reimburse pharmacies at the lowest rate negotiated by any PBM in GoodRx's Information-Exchange Network. For instance, in its press release announcing a partnership with Conspiring PBM MedImpact, GoodRx explained that under the ISP Scheme, "[c]ompanies team up at the pharmacy counter" by "integrating GoodRx's price comparison technology with MedImpact's advanced [claims processing] technology platform." Once MedImpact had joined the ISP Scheme, "when an eligible MedImpact member fills a prescription for a generic medication," the ISP algorithm and database "will automatically compare their benefit and the GoodRx price and then deliver the lowest one." Each of the Conspiring PBMs issued a joint

press release with GoodRx upon joining the ISP Scheme that admits to identical features of the cartel.

**B.    Indirect Evidence of a Horizontal Agreement.**

    *1.    The Conspiring PBMs engage in actions that, absent concerted action, would be against their individual economic self-interest.*

121.    As part of the ISP Scheme, each Conspiring PBM engages in actions that, in the absence of concerted action, would be against their individual economic self-interest, but that maximize profits for the collective under the scheme. These actions against self-interest are strong circumstantial evidence of a horizontal agreement among the Conspiring PBMs to reduce competition for pharmacy business and suppress reimbursement rates.

122.    First, it would be against the unilateral economic self-interest of any individual PBM to pay below-market reimbursement rates to pharmacies for generic drugs (the goal and consequence of coordinating their pricing through GoodRx) because doing so would cause pharmacy defections from those PBMs' networks and, ultimately, economic harm in the output market for PBM services. In the absence of collusion, PBMs would reimburse pharmacies at competitive rates to achieve greater pharmacy satisfaction and avoid the economic harms associated with diminished networks. However, because PBMs know that their competitors have also agreed to pay below-market reimbursement rates, they are insulated from the competitive risks that would exist absent coordination.

123.    Second, it would be against the economic self-interest of any individual Conspiring PBM to share its competitively sensitive and proprietary pricing data and strategies with other insurers through a common third party, unless it knew its main competitor PBMs had agreed to do the same. In the absence of concerted action, PBMs would not share such information with rivals (through an intermediary or otherwise) because of the risk of competitive harm. After all, competitor PBMs could

use the information to make superior bids to unaffiliated pharmacies and strengthen their pharmacy networks relative to the competition.

2.    *The PBM Services Market is susceptible to the formation, mainte-nance, and efficacy of a cartel.*

124.    The PBM Services Market is characterized by numerous features, some-times called "plus factors," that render it susceptible to collusion and bolster the plau-sibility of the cartel alleged herein.

125.    First, on the PBM side, there are high barriers to entry that make it dif-ficult for new PBMs to enter the market for pharmacy benefit management services. These barriers include state and federal regulatory requirements and the costs asso-ciated with developing pharmacy networks, building client relationships, and devel-oping the kinds of technologies and infrastructures that enable PBMs to electronically adjudicate millions of pharmacy reimbursement claims each day.

126.    Second, on the pharmacy side, pharmacies face high exit barriers in the Network Pharmacy Services Market. In the United States, over 80% of all prescrip-tion drug costs are covered by third-party payors. These payors all use PBMs to ne-gotiate prices with pharmacies, process drug claims, and pay reimbursements. Given this reality, pharmacies have no substitutes from which to seek reimbursement for generic drugs but from PBMs retained by third-party payors. The only way for phar-macies to "exit" this third-party payor system is to refuse to fill prescriptions for the vast majority of patients who will not or cannot pay cash, which would spell financial ruin for most pharmacies.

127.    Third, the associated output market for PBM services is highly concen-trated. Currently, the three biggest PBMs manage 79% of prescription drug claims, and the six largest PBMs collectively manage 94% of all claims. The largest PBM, Caremark, accounts for 34% of all prescription drug claims, followed by Express Scripts (23%), OptumRx (22%), Humana (7%), MedImpact (5%), and Prime

Therapeutics (3%). Furthermore, five of those six largest PBMs are vertically integrated with major health insurers.

128.  Fourth, the claims submitted by pharmacies to PBMs for reimbursement from insurers are fungible. All claims are submitted using uniform billing codes, no matter the insurer or the pharmacy. This allows GoodRx to set reimbursement rates for drug claims submitted by different pharmacies to different insurers across different health plans, across the entire country, making it feasible for GoodRx and the Conspiring PBMs to execute their anticompetitive scheme nationwide.

129.  Fifth, members of the alleged cartel have had ample opportunity to meet and collude. The PBMs' trade association, the Pharmaceutical Care Management Association (PCMA), holds annual meetings, business forums, and policy forums. In addition, several GoodRx executives were formerly executives of PBMs. Scott Paul, GoodRx's Senior Vice President of Healthcare & Consumer Innovation, was the Executive Vice President of MedImpact before moving to GoodRx in May 2022, mere months before GoodRx began soliciting PBMs to join its ISP Scheme. Another GoodRx Senior Vice President, Cynthia Meiners, spent twelve years at Express Scripts as a Vice President for Pharmaceutical & Retail Strategies. Agnes Rey-Giraud, a current member of GoodRx's Board of Directors, also spent twelve years at Express Scripts, including as Senior Vice President for Contracting, Strategic Sourcing & Corporate Strategy. Jim Sheninger, a GoodRx Pharmacy Strategy Officer, has previously worked in leadership at both CVS Health and as Senior Vice President for Cigna Pharmacy Management. And Sara Ptakowski, currently serving as the Senior Director for Strategy & Planning in GoodRx's new "Benefits Solutions" "B2B2C vertical," spent five years at Optum as Senior Director of Corporate Strategy. The revolving doors that exist between GoodRx and the Conspiring PBMs create ready opportunities among their executives for explicit agreements to collude.

## VII.   RELEVANT MARKETS AND MONOPSONY POWER

130.   This case concerns a horizontal price-fixing arrangement, which is *per se* illegal and for which a market definition is not needed. To the extent that proof of market power is needed, the collective buying power of the Conspiring PBMs can be established with direct evidence, obviating the need for a market definition. On information and belief, the ISP Scheme reduces net reimbursement amounts for generic drugs (i.e., the amounts pharmacies earn on prescriptions subject to the cartel after all fees are paid to PBMs) by at least 15% of the total amount spent on retail prescription drugs. The Conspiring PBMs would not have been able profitably to impose such significant reductions in generic reimbursement rates—well in excess of a small but significant non-transitory decrease in prices of a hypothetical monopsonist—unless they collectively possessed market (buying) power over pharmacists.

131.   Moreover, the Conspiring PBMs that now use GoodRx to set their generic drug reimbursement rates are responsible for managing 64% of all prescription drug claims in the United States. Given this market share, pharmacies have no real alternative for payors they can sell generic drugs to, as the Conspiring PBMs gatekeep access to a huge portion of potential patients and prescriptions. The Conspiring PBMs' market share is additional direct evidence of the cartel members' collective market (buying) power over pharmacies.

132.   If an antitrust market still needs to be defined, the relevant market is the market for network pharmacy services for purchase by PBMs on behalf of third-party payor clients (the "Network Pharmacy Services Market"). The Network Pharmacy Services Market is the market that has been corrupted by the ISP Scheme. Absent the Scheme, PBMs would compete to enroll pharmacies in their networks by offering superior reimbursement rates on prescription drugs (including generics); instead, the Conspiring PBMs now agree not to outbid each other on pharmacy reimbursement rates for generic drugs. The relevant geographic market is the entire United States,

because PBMs enroll pharmacies in their networks (to provide services to their covered lives) nationwide.

133.   The Network Pharmacy Services Market is an input market. Absent network pharmacy services, PBMs would struggle to compete in the associated output market for PBM services for purchase by third-party payors (the "PBM Services Market"). That's because TPPs decide which PBMs to hire based on the quality and breadth of their pharmacy networks.

134.   In this input market, pharmacies are sellers of prescription drugs, while PBMs (like the Conspiring PBMs) pay for those products on behalf of their TPP clients. Pharmacies have no reasonable economic substitutes to which they could turn in response to a small decrease in reimbursements (below competitive levels) provided by PBMs for generic drugs.

135.   The Network Pharmacy Services Market can be corroborated by practical indicia of the contours of competition. With regard to industry or public recognition of the market, there is widespread recognition in the PBM industry that network pharmacy services are a vital input. And pharmacies commonly express decreased willingness to join particular PBMs' networks when they receive below-market reimbursements from those PBMs.

136.   With regard to the peculiar characteristics and uses of network pharmacy services, such services are unique because network pharmacists are compensated at pre-negotiated rates by the PBM after each transaction has occurred. By contrast, in the retail or cash-pay market for prescription drugs, patients pay the pharmacy at the point of sale, based upon U&C (non-discounted) prices which are unilaterally set by the pharmacy.

137.   The Conspiring PBMs' collective market (buying) power over independent pharmacies can be inferred based on their combined market share in the PBM Services Market, plus evidence of barriers to entry. Four PBMs, including the nation's two largest, have agreed to use GoodRx's ISP pricing methodology for

generic drug claims. These Conspiring PBMs account for at least 64% of all prescription drug claims managed in the United States.

## VIII.  ANTICOMPETITIVE EFFECTS AND INJURY SUFFERED BY CLASS MEMBERS

138.   Since the ISP Scheme went into effect on January 1, 2024, and possibly sooner, it has significantly curtailed competition and reduced reimbursement rates paid to independent pharmacies for generic drug claims.

139.   Rather than paying their own Negotiated Rates for generic drugs, the Conspiring PBMs now outsource their rate-setting decisions to GoodRx, which has access to a massive amount of CSI from the GoodRx Information Exchange Network (including each PBM's Negotiated Rates with pharmacies). The PBMs agree to always select the lowest rate when calculating the reimbursements they offer pharmacies. In other words, the Conspiring PBMs have entered into an unlawful agreement not to outbid each other for what they reimburse pharmacies for generic drugs.

140.   The outsourcing of Conspiring PBMs' generic drug reimbursement decisions, as well as their anticompetitive information exchange, has corrupted the Network Pharmacy Services Market (an input market, defined above), replacing independent centers of decision-making with respect to reimbursement rates with a single effective decision-maker, GoodRx, disrupting the competitive process.

141.   Both economic theory and antitrust jurisprudence recognize that joint delegation schemes, particularly when accompanied by information exchange, reduce the intensity of price competition and artificially suppress compensation below competitive levels.

142.   By analogy, in recent guidance to human resources professionals, the Department of Justice Antitrust Division ("DOJ") stated that "[s]haring information with competitors about terms and conditions of employment" can be anticompetitive by allowing firms to match each other's compensation rather than compete for services by offering additional compensation. That is precisely what has happened with

respect to the reimbursement rates PBMs negotiate with pharmacies for generic drug claims.

143.   As a result of the GoodRx ISP Scheme, reimbursement rates provided to pharmacies for generic drug claims have been suppressed below competitive levels. Navitus and MedImpact, the smaller Conspiring PBMs, now pay the same Negotiated Rates on generics as the nation's largest PBMs, Caremark and Express Scripts. In the absence of coordination, such smaller PBMs would not qualify for the same volume discounts from pharmacies as larger pharmacies and would have to outbid their larger rivals. A smaller PBM that offered pharmacies the kinds of low reimbursement rates that only the largest PBMs qualify for would be unable to build and maintain its pharmacy network and would suffer competitive harms in the output PBM Services Market.

144.   In addition, the curtailment of competition in the Network Pharmacy Services Market has driven down the pharmacy reimbursement rates all the Conspiring PBMs pay pharmacies. Even if the largest Conspiring PBMs, Caremark and Express Scripts, are already able to negotiate the best overall discounts from pharmacies given their massive buying power, it does not mean that for any given drug, these PBMs will have secured the lowest price. It simply means that across all drugs, these large PBMs will usually secure the lowest total "package" of drug prices. The ISP Scheme ensures that for each and every generic drug prescription, the Conspiring PBMs always pay the lowest price negotiated by any rival PBM in the GoodRx Information-Exchange Network, which would not be the case absent the alleged cartel.

## IX.   CLASS ACTION ALLEGATIONS

145.   Plaintiff brings this action on behalf of itself, and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) as representatives of the proposed Class, which is defined as follows:

> All pharmacies in the United States that are not members
> of the same corporate family as a Conspiring PBM and that

were reimbursed for generic drugs pursuant to the GoodRx

Integrated Services Program.

146.    The Class is so numerous that joinder of all members in this action is impracticable. There are tens of thousands, if not hundreds of thousands, of members in the proposed Class.

147.    Plaintiff's claims are typical of those of the Class because Plaintiff presses the same legal theories, and seeks to redress the same injury, for itself as for all members of the proposed Class.

148.    Plaintiff and all members of the Class were injured by the same unlawful conduct, which resulted in all of them receiving less compensation for generic drugs from PBMs than they otherwise would have in a competitive market.

149.    Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiff are not antagonistic to the Class.

150.    Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual members.

151.    Defendants and the Conspiring PBMs have acted and refused to act on grounds generally applicable to members of the proposed Class, such that injunctive and declaratory relief is appropriate with respect to the proposed Class as a whole.

152.    Questions of law and fact common to the Class include but are not limited to:

- whether GoodRx and the Conspiring PBMs have entered into a contract, combination, conspiracy, or common understanding to artificially suppress reimbursement rates for generic prescription drugs;
- whether, if GoodRx and the Conspiring PBMs entered into such a contract, combination, conspiracy, or common understanding, that conduct is a *per se* violation of Section 1 of the Sherman Act;

- whether the conduct of GoodRx and the Conspiring PBMs has in fact artificially suppressed reimbursement rates paid to members of the proposed Class;

- the proper measure of damages for the proposed Class;

- the contours of appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

153.   Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex antitrust and unfair competition class actions.

154.   Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

## X.    CAUSES OF ACTION

### COUNT ONE

**Agreement in Restraint of Trade in Violation of**

**Section 1 of the Sherman Antitrust Act**

155.   Plaintiff incorporates each allegation above as if fully set forth herein.

156.   Defendants and the Conspiring PBMs, directly and through their divisions, subsidiaries, agents, and affiliates, engage in interstate commerce in the purchase and reimbursement of prescription drugs for health plan members and in the provision of PBM services.

157.    Defendants and the Conspiring PBMs entered into and engaged in an unlawful contract, combination, or agreement in restraint of trade and commerce in violation of the Sherman Act, 15 U.S.C. § 1.

158.    Specifically, Defendants and the Conspiring PBMs have combined to form a cartel to artificially suppress reimbursement rates paid to pharmacies across the country for generic drugs, and they have exchanged non-public and competitively sensitive information with one another in order to accomplish that purpose.

159.    The conduct of Defendants and the Conspiring PBMs was undertaken with the intent, purpose, and effect of artificially suppressing reimbursement rates on generic drugs below competitive levels.

160.    Defendants and the Conspiring PBMs perpetrated this scheme with the specific intent of decreasing pharmacy reimbursement rates for their own benefit.

161.    The conduct of Defendants and the Conspiring PBMs in furtherance of the unlawful scheme described herein was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of the affairs of Defendants and the Conspiring PBMs.

162.    The GoodRx Cartel has caused the Class to suffer damages in the form of artificially suppressed reimbursement rates.

163.    There are no procompetitive justifications for the GoodRx Cartel, and any proffered justifications, to the extent cognizable, could be achieved through less restrictive means.

164.    The GoodRx Cartel is unlawful under a *per se* mode of analysis. In the alternative, the GoodRx Cartel is unlawful under either a quick look or rule of reason mode of analysis.

165.    As a direct and proximate result of this unlawful scheme, Plaintiff and the members of the proposed Class have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition unless Defendants' conduct is enjoined.

166.   Plaintiff and the Class are entitled to recover three times the damages sustained by them, interest on those damages, together with reasonable attorneys' fees and costs under Section 4 of the Clayton Act, 15 U.S.C. § 15.

167.   Plaintiff and the Class are entitled to a permanent injunction that terminates the unlawful conduct alleged herein as well as any other equitable relief the Court deems proper.

## XI.    PETITION FOR RELIEF

Plaintiff petitions for the following relief:

a) A determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiff be appointed as class representative, and that Plaintiff's counsel be appointed as class counsel;

b) A determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Antitrust Act;

c) A judgment and order requiring the defendants to pay damages to Plaintiff and members of the Class, trebled;

d) An order enjoining the defendants from engaging in further unlawful conduct;

e) An award of attorneys' fees and costs;

f) An award of pre- and post-judgment interest on all amounts awarded; and

g) Such other and further relief as the Court deems just and equitable.

## XII.   JURY DEMAND

168.   Plaintiff, on behalf of itself and the Class, demands a jury trial on all issues triable as of right before a jury.

Dated: November 1, 2024                    **SUSMAN GODFREY L.L.P.**

By: */s/ Halley Josephs*

Halley Josephs (338391)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Tel. (310) 789-3100
Fax (310) 789-3150
hjosephs@susmangodfrey.com

Bill Carmody (*pro hac vice forthcoming*)
Shawn Rabin (*pro hac vice forthcoming*)
Tom Boardman (276313)
Henry Walter (*pro hac vice forthcoming*)
SUSMAN GODFREY L.L.P.
One Manhattan West, 50th Floor
New York, New York 10001
Tel. (212) 336-8330
Fax (212) 336-8340
bcarmody@susmangodfrey.com
srabin@susmangodfrey.com
tboardman@susmangodfrey.com
hwalter@susmangodfrey.com

**EDELSON PC**

By: */s/ Natasha Fernández-Silber*

Natasha Fernández-Silber (*pro hac vice forthcoming*)*
Julian Zhu (*pro hac vice forthcoming*)
Abby Lemert (*pro hac vice forthcoming*)
EDELSON PC
350 N La Salle Dr., 14th Floor
Chicago, IL 60654
Tel. (312) 589-6370
Fax (312) 589-6378
nfernandezsilber@edelson.com
jzhu@edelson.com
alemert@edelson.com
*Admitted in Michigan and New York only

Yaman Salahi (288752)
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel. (415) 212-9300
Fax (415) 373-9435
ysalahi@edelson.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT
Case No.: 2:24-cv-9490